# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MOUNT HOLLY KICKBOXING, LLC,
and DHYAN TARVER (individually),

        Plaintiffs,

v.

FRANCHOICE, INC., and
CAREYANN GOLLIVER,

        Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 19-300 (MJD/ECW)

Elliot R. Ginsburg, Erin C. Johnsen, and W. Michael Garner, Garner, Ginsburg & Johnsen, P.A.; Michael J. Adams, Ward Greenberg Heller & Reidy LLP; and Robert B. Calihan, Calihan Law PLLC, Counsel for Plaintiffs.

Ryan O. Vettleson, and Sonia L. Miller-Van Oort, Sapientia Law Group PLLC, Counsel for Defendants.

## I.   INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Partial Summary

Judgment [Docket No. 57] and Defendants' Motion for Summary Judgment

[Docket No. 64].  The Court heard oral argument on February 3, 2021.  Because

all but one of the statements upon which Plaintiffs base their claims are not

actionable, and reasonable reliance cannot exist for the statement that no ILKB outlet had closed, the Court grants summary judgment for Defendants.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   ILKB

ILKB LLC ("ILKB") is a franchisor of the iLoveKickboxing.com franchises, which operate retail kickboxing fitness studios. (Def. Ex. N, ILKB May 9, 2016 financial disclosure document ("FDD") at 1-2.) ILKB first began offering franchises in April 2012. (Id.)

ILKB's founder and CEO, Michael Parrella, was discharged from bankruptcy in 2008. (Garner Opp. Decl., Ex. 15, In re Parrella (Bankr. E.D.N.Y. Nov. 25, 2013) Order, at 1.) Federal and New York law require that bankruptcy discharges of franchisor officers, such as Parrella, that occurred during the ten-year period before the date of the franchisor's franchise disclosure document ("FDD") must be disclosed in the FDD. 16 C.F.R. § 436.5(d); 13 N.Y.C.R.R. § 200.2(c), Item 4. A franchisor must disclose at Item 3 of the FDD any pending cases in which the franchisor, a principal, or a predecessor, was the subject of civil claims alleging fraud, violation of a franchise law, misappropriation of property, or similar allegations and any such cases in which liability was

incurred in the ten years before the filing of the FDD.  16 C.F.R. § 436.5; 13

N.Y.C.R.R. § 200.2(c), Item 3.  ILKB, Parrella, or ILKB's predecessor, FC Online

Marketing, were involved in multiple cases pending at various times from 2013

through 2016 claiming violations of franchise acts, fraud, theft of services and

malicious denial of services; however, there is no evidence in the record that they

incurred liability in those cases.  (See Garner Opp. Decl., Exs. 10-14.)

### 2.     The Parties

#### a)     FranChoice, Inc.

Defendant FranChoice, Inc. ("FranChoice") is a Minnesota corporation

with its principal place of business in Eden Prairie, Minnesota.  It "provides

consulting and referral services to potential franchisees and introduces possible

franchises that the prospective franchisee may be interested in considering and

exploring directly with the franchisors."  (Compl. ¶ 5; Answer ¶ 5.)

FranChoice has an inventory of franchisors to whom it refers candidates.

In deciding whether to include a franchisor in its inventory, FranChoice looks for

franchisors that have a management or executive team with an interesting

business plan or idea for developing the franchise and great communication,

strong validation by their existing franchisees, the opportunity to make

3

franchisees money, and good territory availability.  (Def. Ex. A, Elgin 30(b)(6)

Dep. 48-51; Def. Ex. H, Halvorson 30(b)(6) Dep. 43.)  FranChoice considers a

"high quality franchise business" to be one that makes money, has happy

franchisees, has good territory availability, and has a good system for

communicating with prospective franchisees (i.e., "a system that enables a

prospective franchisee to get all the information they need during their

investigation of the franchise in order to make an informed business decision on

whether or not to get the franchise").  (Elgin 30(b)(6) Dep. 54-55.)

In determining which franchise systems to include in its inventory,

FranChoice primarily does four things: (1) reviews a franchisor's FDD; (2)

conducts interviews with the franchisor's management executives; (3) interviews

the franchisor's existing franchisees; and (4) through interviews or written

materials, analyzes the franchisor's communication and documentation system

for its communications with prospective franchisees.  (Halvorson Dep. 30(b)(6)

51–54; Def. Ex. II, FranChoice onboarding document; Elgin 30(b)(6) Dep. 55.)

After FranChoice agrees to a referral relationship with a franchisor, it does not

again review the franchisor's yearly financial statements or FDDs or conduct an

independent search of its litigation history.  (Garner Decl., Ex. 27, Elgin Dep. 20-23.)

### b)   Careyann Golliver

Defendant Careyann Golliver became a FranChoice consultant in 2013.  (Def. Ex. B, Golliver Dep. 9-10.)  She had previously worked as part owner of a franchisor where she was the franchise development manager selling franchises to prospective buyers and supporting the current franchise owners.  (Id. 13-14.)  She then worked for another company selling franchises before joining FranChoice.  (Id. 15.)  Golliver resides in Colorado.  (Compl. ¶ 6; Answer ¶ 6.)

As a FranChoice consultant, Golliver obtained information about ILKB from ILKB's launch call; ILKB's one sheets, which are summaries of its business; information from other FranChoice consultants; FranChoice's Entree system; and ILKB presentations at semi-annual meetings.  (Golliver Dep. 67-79, 108; Elgin 30(b)(6) Dep. 66-67.)  She never saw an ILKB FDD.  (Golliver Dep. 78-79.)

### c)   Dhyan Tarver

Plaintiff Dhyan Tarver is a resident of North Carolina.  (Compl. ¶ 4; Answer ¶ 4.)  Tarver graduated from the United States Military Academy West Point in 2006 with a major in systems engineering.  (Def. Ex. K, Tarver Dep. 19.)

5

As part of that major, he took business classes such as corporate finance, accounting, and project management.  (Id. 21-22.)  In 2010, Tarver received an MBA with a concentration on entrepreneurship from Trident University.  (Id. 20, 29-32.)  He was honorably discharged from the Army as a Captain in 2011.  (Id. 38-47.)  He then worked as an outside salesperson at a plumbing manufacturing company.  (Id. 50-51.)  He was promoted to regional sales manager in 2013 and by the end of 2017, he was managing 20 sales representatives and in charge of seven states.  (Id. 52-53, 57.)  At the end of 2017, he moved to a new role managing the company's inside sales process.  (Id. 58.)  In August 2018, he was promoted to nationwide wholesale pricing and billing manager, a role in which he managed five personnel and the corporate office's receptionist desk.  (Id. 58.)

In addition to his regular employment, Tarver set up a real estate investment business in 2008.  (Tarver Dep. 76.)  He currently owns seven properties, including his residence, throughout the United States and has hired property managers to assist him.  (Id. 69, 71, 77-79.)

Before purchasing an ILKB franchise, Tarver had never raised capital, found a location and negotiated a lease for a business, marketed a business, or

managed customers.  (Tarver Opp. Decl. ¶ 7.)  He had no prior experience with

boutique fitness studios and knew almost nothing about franchising.  (Id.)

### d)    Mount Holly Kickboxing, LLC

Tarver formed Plaintiff Mount Holly Kickboxing, LLC ("Mount Holly"), a

North Carolina limited liability company, on December 16, 2016.  (Def. Ex. R.)

### 3.    Formation of the Relationship Between ILKB and FranChoice

FranChoice and ILKB's relationship began in September 2013.  (See Def.

Ex. H, Halvorson 30(b)(6) Dep. 30-31.)  When determining whether to enter into a

referral relationship with ILKB, FranChoice followed its usual screening process

and reviewed ILKB's then-current 2013 FDD, which included information

regarding litigation, length of time franchising, bankruptcy history, and financial

statement; spoke with ILKB management; reviewed ILKB's marketing material

and then-current sales process; and spoke with all ten of ILKB's existing standard

outlet or stand-alone franchisees in existence at that time (which was the model

that would be subject of any referrals made by FranChoice to ILKB) to see if their

experience to date matched up with ILKB's explanation of its business.  (See

Halvorson 30(b)(6) Dep. 44-45, 49, 55, 60, 68, 71-72, 90, 92-93, 107-08, 117-18; Elgin

30(B)(6) Dep. 14-20, 55-56; see also Garner Opp. Decl., Ex. 2 ILKB 2013 FDD.)  The

validation calls with franchisees "were very positive, every franchisee."

(Halvorson 30(b)(6) Dep. 113-14.)  ILKB's 2013 FDD did reveal Parrella's

bankruptcy.  (See ILKB 2013 FDD at Item 4.)  It did not reveal any relevant

litigation.  (Id. at Item 3.)

FranChoice did not conduct any independent review of the litigation

history of any franchisor or its principals beyond reading the FDD, did not verify

the information in the FDD, and admitted that it was "absolutely" possible that

false information in a franchisor's launch call or FDD could be passed on to

FranChoice consultants, who could then pass such false information to

candidates.  (Garner Decl., Ex. 27, Elgin Dep. 20, 33-34.)  Neither FranChoice nor

its consultants review a franchisor's yearly updated FDD as a matter of course.

(Id. 21-22.)

In November 2013, FranChoice entered into a Referral Agreement with

ILKB that provided that ILKB would pay FranChoice a referral fee for each

candidate that FranChoice referred that purchased an ILKB territory: $30,000 for

a single territory, $50,000 for three territories, and more for more territories.

(Garner Opp. Decl., Ex. 3, FranChoice Referral Agreement § 2.2.)

4.      **ILKB's Inappropriate Financial Performance Representations**

In March 2015, FranChoice's CEO, Jeffrey Elgin, became aware that ILKB was making unlawful financial performance representations to prospective franchisees in its marketing materials.  (Garner Opp. Decl., Ex. 7.)  According to Elgin, ILKB had provided a marketing video that "breaks out all the costs and completely covers the unit economics;" however, according to Elgin, "FTC rules absolutely forbid providing this sort of specific financial information to any prospective franchisee unless it is done in writing in Item 19 of your FDD.  Your Item 19 not only doesn't include any such information but it specifically says that you do not provide any such information to prospects in any form."  (<u>Id.</u>)  Elgin called ILKB's Scott Ferrari.  (Elgin Dep. 159-61.)  Elgin asked how long ILKB had been using the materials and how many people had received them.  (<u>Id.</u>; Elgin Decl. ¶ 24.)  Ferrari said that the materials had only been used for a few days and had only been provided to a few prospects.  (Elgin Dep. 160; <u>Id.</u> ¶ 25.)  Elgin told Ferrari that ILKB should immediately stop using the materials until its attorney had reviewed them and should talk to the people who had already received the materials.  (<u>Id.</u> ¶ 26.)  Ferrari told Elgin to put his concerns in writing so that the concerns could be given to Parrella, who had prepared the materials.  (<u>Id.</u> ¶ 27.)

On March 31, 2015, Elgin sent an email to Ferrari stating that the earnings claims were "blatantly illegal," ILKB "**should cease using this video immediately**," and should contact ILKB's franchise lawyer to figure out what to do regarding anyone who had already seen the video.  (Garner Opp. Decl., Ex. 7.)  Ferrari responded the same day that he had sent the marketing materials to ILKB's attorney for review and would speak with him later that day about how to remedy the issue of exposure to anyone who had received those marketing materials.  (Id.)  Immediately after reading the email, Elgin called Ferrari and asked him to assure that ILKB would not use any of the material unless and until it had been approved by ILKB's franchise attorney and that ILKB would work on a plan with its attorney "to go back to every single . . . prospective franchisee that's ever seen any of this material and do whatever it takes to remedy that error."  (Elgin Dep. 150-51, 160-61.)  Ferrari responded that "[a]bsolutely" they would do so and that he would work with the "attorney to go backwards and take care of anybody that had ever seen it."  (Id.)

### 5.    Elgin Awareness of Issues with Parrella

Sometime in 2016, Parrella had become unresponsive to Elgin.  (Def. Ex. MM, Elgin Dep. 182.)  In a June 1, 2016, email to Parrella, Elgin raised complaints

that FranChoice had been hearing about ILKB from franchisees. (Garner Decl., Ex. 8, June 1, 2016 Email from Elgin to Parrella.) He had heard complaints that ILKB was adding a marketing fee to pay for Parrella's lavish lifestyle that franchisees saw documented on FaceBoook; that, at Discovery Day, ILKB representatives excitedly talked about rolling out new concepts making existing franchisees worry that ILKB would lower its support or focus in favor of the new concept; and that franchisees were quickly getting to their breakeven point but then not growing very quickly after that. (Id.) He opined that the types of complaints that he was hearing from franchisees "is also quite prevalent with the franchisees in every system I know or have heard about." (Id.) Elgin suggested that Parrella "1) limit activities and actions that might make these issues worse, and 2) start thinking about taking some proactive steps (like creating a franchisee advisory council for example) that might provide an outlet to let some of this predictable 'steam' out of the system." (Id.)

      **6.**    **Formation of the Relationship Between FranChoice and Tarver**

          **a)**    **Email Introduction**

Tarver first contemplated purchasing a franchise in 2008.  (Tarver Dep. 84.)
He conducted preliminary investigations into several types of franchise
businesses throughout his service in the military.  (Id. 84, 93-94.)

In 2016, Tarver discussed the idea of owning a franchise with a friend, and
the friend recommended that Tarver talk to Golliver.  (Tarver Dep. 95-97.)  The
friend connected Tarver and Golliver through email.  (Id. 99-100.)

On August 8, 2016, Golliver sent Tarver an email with a link for him to
complete a Confidential Questionnaire.  (Tarver Dep. 100-01.)

### b)    FranChoice Website

Tarver examined FranChoice's website before he submitted his responses
to the Confidential Questionnaire.  (Tarver Dep. 102-03; Tarver Decl. ¶ 15.)

FranChoice's website made various statements, including:

> We've done much of the homework for you.  We have carefully pre-
> screened hundreds of companies from all areas of franchising.  . . .
> We can't do your research for you.  Only you can conduct a
> thorough and complete investigation of franchise opportunities to
> determine if one is right for you.

> These companies must meet the exacting standards we have set to
> be included in our inventory.  We examine the record of the
> franchisor relating to litigation, failures and, most importantly, the
> satisfaction of the existing franchisees with the people and
> opportunity they are involved in.  We only want to work with the
> best.  . . .

(Garner Decl., Ex. 1 at FC2793.)

The website also mentioned that using FranChoice would allow candidates to "avoid the confusion of researching the overwhelming myriad franchise opportunities and [] concentrate on those that have been pre-screened as high quality franchise businesses matching your requirements." (Id. at FC2781.) "Whatever the person's interests or previous experience, we have a stable, growth-oriented, franchisee-friendly company that we can introduce." (Id. at 2920.) And it claimed that FranChoice had "carefully hand-picked each of the franchise companies in our inventory. We only work with companies that have successful franchisees in their systems. They must validate well and have a strong operations model in place." (Id. at 2920-21.)

FranChoice represented: "We provide the information a potential franchisee needs to find the opportunity that fits their goals, plus we already know many of the safest and most attractive opportunities in franchising, a task that can take months for someone outside the industry." (Id. at FC2792.)

> Our consultants must go through a thorough and rigorous training program over a six-week period. . . . They must be trusted advisors to their candidates and to do that, they need to truly understand each of our franchise companies so they can represent the business accurately.

(<u>Id.</u> at FC2921.)

Finally, it referred to FranChoice consultants as "the Franchise Experts." (<u>See, e.g.</u>, <u>id.</u> at FC2780.)

Tarver claims that, based on these representations on the FranChoice website, he understood that FranChoice would only present him with franchises that passed its "exacting standards" to be "strong" and "high quality" (Tarver Opp. Decl. ¶ 19); that FranChoice would present him "only with franchises that were safe, stable, and high-quality" (<u>id.</u> ¶ 20); and that he would have "all of the information that [he] needed about a franchise, particularly with respect to litigation and potentially adverse information" (<u>id.</u> ¶ 21).

In a section entitled "Doing Your Homework to Find Your Perfect Franchise," the website explained that an FDD

> is the Federal Trade Commission mandated disclosure document that gives you a wealth of information about the franchisor. The form and composition of the document is standard with any franchisor and must include information on a variety of topics of interest to you. The major subject areas include . . . Any relevant litigation history of the company or its officers . . . .

(<u>Id.</u> at FC2786-87.)

14

The website also repeatedly emphasized that candidates had to conduct their own investigations.  For example, it stated: "You will carefully review the FDD and note any questions or issues that the material raises for further discussion with the franchisor.  You may also choose to involve outside advisors to review material you do not understand."  (Id. at FC2787.)  "The most valuable source of information on any franchise system is the existing franchisees.  You need to plan on calling or visiting a number of the franchisees during your investigation."  (Id. at FC2787.)  "At some point in the process of investigation, you will want to have personal meetings with key personnel of the franchise company."  (Id. at FC2788.)  "If you have been diligent, the entire process outlined above should have taken about two and four weeks to complete.  You have now finished your investigation and have all the information you need to determine if this franchise is right for you." (Id. at FC2788-89.)

The website explained that, after a candidate tells a consultant what they are looking for in a franchise,

[a] FranChoice consultant will then present a selection of companies to the candidate.  It is up to the candidate to then do his own research by calling existing franchisees in the system, talking to people in the franchisor's home office and, if there is interest by both parties, to schedule a "discovery day" to visit the home office.

(Id. at 2921.)

### c)      Communications with Golliver

During a 90-minute Consultation Call on August 18, 2016, Golliver and Tarver reviewed his Questionnaire responses, discussed FranChoice and Golliver's consulting role, and discussed different franchise ownership models in general.  (Tarver Dep. 122-24, 130-33.)  Tarver told Golliver that he was not going to leave his fulltime job so he needed a franchise that worked on an absentee owner model and would not require his fulltime presence.  (Tarver Dep 116-118; Tarver Decl. ¶ 27.)

On August 30, Golliver conducted a Franchise Introduction Call with Tarver.  (Tarver Dep. 144-45.)  She identified three potential franchises that Tarver might be interested in: Sandler Training, All About People, and ILKB. (Id.; Def. Ex. DD, Aug. 30, 2016 Email from Golliver to Tarver.)  Golliver told Tarver that it was important for him to conduct an aggressive investigation of all of the concepts.  (Tarver Dep. 146-48.)

Plaintiffs claim that, during the call, Golliver made a number of representations about ILKB franchises' suitability for absentee ownership, expected profits, cost of initial investment, breakeven points, lack of closures,

and how well ILKB worked with franchisees.  The full alleged comments are set

forth below in Section III(B), Statements at Issue for Counts 1, 3, and 4.

After the telephone call, Golliver sent Tarver FranChoice's Franchise

Company Investigation Procedure document, which he read.  (Tarver Dep. 148-

50; Def. Ex. F.)  The Franchise Company Investigation Procedure listed the

principal areas that Tarver should investigate as to each franchise.  (Tarver Dep.

162-63.)  It stated:

> You've carefully evaluated yourself and built an individual model
> that can be used to determine if a franchise opportunity has the
> components you want. . . .  Now you just need a process to
> investigate individual franchise companies and determine if they fit
> perfectly into your plans.

(Franchise Company Investigation Procedure at 1.)

The document explained six steps that the candidate should follow in

order to investigate the franchise opportunities presented to them by

FranChoice: 1) reviewing the general information provided by the franchisor 2)

reviewing the FDD provided by the franchisor; 3) validating by calling and

visiting existing franchisees (listing a variety of questions to ask during

validation, including earnings, investment required, support from the franchisor,

marketing programs, and training); 4) reviewing the system documentation from

the franchisor regarding their operations, systems, and marketing programs; 5)

meeting the franchisor's key personnel, evaluating their competence, and asking

remaining questions; and 6) making a decision.  (Franchise Company

Investigation Procedure.)

Based on Golliver's communication to him, Tarver understood that it

would take time and effort on his part to conduct due diligence to determine

whether any of the franchises identified would be a good fit for him.  (Tarver

Dep. 149-50.)  He also understood that choosing a franchise and being selected to

be a franchisee was a process of mutual elimination by himself and a franchisor.

(Id.)  He expected that the franchisor would be the most knowledgeable source

for information about its franchise.  (Id. 160.)  Golliver also provided Tarver with

questions to ask franchisees during validation calls and questions to ask the

franchisors.  (Tarver Dep. 228-30.)

Golliver connected Tarver to the three franchises, and then those three

franchisors contacted him directly.  (Tarver Dep. 166-67.)  Tarver determined that

one of the franchises was not suitable for absentee or semi-absentee ownership

and the other was outside of his budget, leaving only ILKB as a possibility.

(Tarver Decl. ¶ 28.)

18

Golliver avers that, at the time that she recommended ILKB to Tarver, she

had heard positive reports from other candidates she had referred to ILKB, and

candidates had heard positive feedback during their validation.  (Golliver Decl.

¶¶ 14, 17.)  Validation of ILKB remained strong and positive during the time

FranChoice and its consultants were making referrals to it.  (Elgin Decl. ¶ 20.)

### 7.    Tarver's Communications with ILKB

After Golliver connected Tarver with ILKB, he was contacted by ILKB's

Aaron Geary.  (Tarver Dep. 166-67.)  Tarver set up an appointment with Geary

for September 1 and requested ILKB's FDD from him.  (Id. 168-69.)  Throughout

Tarver's interactions with ILKB, ILKB representatives made a number of

representations to him such as ILKB studios did not require direct owner

involvement; all he would have to do was visit the studio and pick up a pile of

cash; that the "sweet spot" for total investment was $250,000; and that ILKB

franchisees should be making $120,000 a year in profits.  (Garner Opp. Decl., Ex.

22, Tarver Int. Response No. 3.)  They also stated that ILKB had 150 open

locations and that none had ever failed; that on average, 600 memberships were

sold before opening and that the fewest sold was 315; that the monthly expenses

of a studio were $26,000; and that it was only necessary to have 200 members to

breakeven, and, after that every member was 80 percent profit, which worked

out to $10,000 a month or more than $100,000 a year.  (Tarver Opp. Decl. ¶ 30.)

### 8.    ILKB's FDD

ILKB provided its FDD to Tarver on September 1, 2016.  (Def. Ex. M, Sept.

1, 2016 Email from Geary to Tarver.)  Tarver read the entire FDD.  (Tarver Dep.

220.)  He also went over parts of the FDD with his friend who is a Quiznos

franchisee.  (Tarver Dep. 220-22.)

The FDD's cover page stated:

> The total investment necessary to begin operation of a single
> iLoveKickboxing.com Outlet is $120,849 to $312,199.  This includes
> $49,999 that must be paid to the franchisor and its affiliates.  If you
> sign a Multi Outlet Agreement, instead of $49,999, you would pay
> ILKB a development fee of (i) $110,000 for 3 Outlets, (ii) $145,00 for 5
> Outlets[] , or (iii) $145,000 for the first 5 Outlets plus $17,500 for each
> additional Outlet thereafter, up to 10 (maximum of $232,500).

(Def. Ex. N, ILKB May 9, 2016 FDD ("ILKB 2016 FDD").)

The FDD included a "List of Terminated Franchises" that listed the name,

location and telephone number for franchisees that "had an outlet terminated,

canceled or not renewed, or otherwise voluntarily or involuntarily ceased to do

business under its franchise agreement during" 2015 and the period of January 1,

2016 to May 9, 2016.  (<u>Id.</u> at Bates No. MNTH0524-25.)  Ten individuals related to

twelve franchise outlets were listed.  (Id.)  The FDD also included a separate

chart for 2013 to 2015 showing the number of outlets transferred from franchisees

to new owners other than the franchisor (1 outlet in Nebraska in 2014) and a

separate chart for 2013 to 2015 showing franchised outlet terminations (1 in

Massachusetts, 1 in New Jersey, 2 in New York, 1 in Rhode Island, 2 in

Australia); outlets reacquired by the franchisor (3 outlets in New York, 1 in

Nebraska); and outlets that "Ceased Operations – Other Reasons" (1 in

Delaware, 1 in Florida, 1 in Idaho).  (Id. at MNTH434-436.)

Item 4 of the FDD stated that no bankruptcy needed to be disclosed, and

Item 3 stated that no litigation needed to be disclosed.

### 9.   Validation

Tarver knew that he should talk to existing ILKB franchisees to understand

their experiences.  (Tarver Dep. 158, 160.)  Tarver understood that all of the

franchisees' locations were identified in the FDD and that he could reach out to

them if he chose to.  (Id. 161.)

Tarver participated in group validation conference calls in September 2016.

(Tarver Dep. 184-86, 192-96, 200-03, 213-17, 225-36.)  He spoke with three

different franchisees and text messaged with others.  (Id.)  They told him about

marketing successes that the franchises were experiencing and that ILKB was successful in marketing for them.  (Id. 224.)  They talked about their start-up costs, staffing, marketing, membership levels, and hiring practices.  (Tarver Opp. Decl. ¶ 32.)  Tarver knew that he could have spoken one-on-one with franchisees but was satisfied with the group calls.  (Tarver Dep. 216-17.)  None of the franchisees contradicted the representations that ILKB had made.  (Tarver Opp. Decl. ¶ 32.)

### 10.    Discovery Day

Tarver attended Discovery Day at ILKB's headquarters in New York in early October 2016.  (Tarver Dep. 203.)  ILKB provided information about the costs of running the business, ILKB's marketing tactics, staffing, and other information about the process of purchasing, opening, and running an ILKB franchise.  (Tarver Dep. 205-06, 208-12.)  After attending Discovery Day, Tarver decided to purchase an ILKB franchise.  (Tarver Dep. 266.)

On October 10, Golliver contacted Tarver to find out how Discovery Day went, and Tarver told her that he had told ILKB that he wanted to move forward. (See Def. Ex. O.)  Tarver and Golliver had no more contact after October 2016

other than email newsletters that Golliver sent to her contacts and when Tarver

referred several friends to Golliver.  (Tarver Dep. 290-91; Def. Ex. Q.)

### 11.    Tarver's Purchase of an ILKB Franchise

On October 20, 2016, Tarver signed the ILKB Franchise Agreement.  (Def.

Ex. P, Franchise Agreement.)  He paid a $49,999 franchise fee to ILKB.  (Id.;

Tarver Opp. Decl. ¶ 33.)  Tarver signed the Franchise Agreement in his

individual capacity only.  (Id. 261; Franchise Agreement.)

### 12.    Formation of Mount Holly

Tarver incorporated Mount Holly on December 1, 2016 in order to operate

the ILKB kickboxing studio.  (Def. Ex. R; Tarver Dep. 262-63.)  On January 19,

2017, Tarver executed a Transfer of Franchise and assigned the Franchise

Agreement from himself to Mount Holly.  (Def. Sealed Ex. S.)

### 13.    Operation of the Studio

Tarver invested $65,000 of his own money and borrowed $309,500 to start

the studio.  (Tarver Opp. Decl. ¶ 34.)  He invested $205,000 in construction costs,

equipment purchases, and working capital.  (Id.)

Plaintiffs opened a kickboxing studio in Charlotte, North Carolina in June

2017.  (Tarver Dep. 267.)  According to Tarver, from the start, the studio was not

suitable for absentee or semi-absentee ownership, and Tarver and his wife had to spend their evenings and weekends at the studio.  (Tarver Decl. ¶ 31.)  ILKB's marketing was ineffective, so "too few people signed up for memberships."  (Id.)  ILKB was unhelpful when he reached out for help.  (Id.)

In the 18 months that the studio was open, Tarver went through 5 different managers.  (Def. Ex. T, Mount Holly Dep. 152-53; Def. Ex. W.)  During periods that the studio was between managers, Tarver stepped in to act as manager although he still had other fulltime employment.  (Tarver Dep. 276-77; Mount Holly Dep. 173-74.)  Tarver closed the studio on December 29, 2018.  (Tarver Decl. ¶ 31.)

### 14.    Damages

Plaintiffs claim the following damages:

| | |
|---|---|
| Franchise Fee | $49,999.00 |
| Buildout and investment in studio | $205,000.00 |
| Operating Losses 2016 – 2020 | $358,305.82 |
| Remaining lease liability | $52,962.00 |
| Member refunds on closing | $4,797.21 |
| Other costs of mitigation | $1,145.50 |
| Amounts realized on salvage sale | ($11,948.00) |
| | |
| **Total Damages** | **$660,261.53** |

(Tarver Decl. ¶ 32.)

24

**B.      Procedural History**

On February 7, 2019, Tarver and Mount Holly filed a Complaint against FranChoice and Tolliver in this Court.  [Docket No. 1]  The Complaint asserts: Count 1: Violation of the New York Franchise Sales Act; Count 2: Violation of the North Carolina Unfair and Deceptive Trade Practices Act; Count 3: Fraud; and Count 4: Negligent Misrepresentation.  The parties agree that New York law applies to Count 1: Violation of the New York Franchise Sales Act; North Carolina law applies to Count 2: North Carolina Unfair and Deceptive Trade Practices Act; and Minnesota law applies to Count 3: Fraud; and Count 4: Negligent Misrepresentation.  (Def. Opening Brief at 27-28; Pls. Opp. at 22.)

Plaintiffs now move for summary judgment in their favor in the amount of $660,261.53, plus interest and costs, on Count II, violation of the North Carolina Unfair and Deceptive Trade Practices Act, and striking Defendants' fourth affirmative defense, for acting reasonably, in good faith, and in compliance with contractual, common law and statutory obligations.  Defendants have filed a cross-motion for summary judgment on all counts.

**III.      DISCUSSION**

**A.      Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## B.    Statements at Issue for Counts 1, 3, and 4

Plaintiffs' claims for Counts 1, 3, and 4 are based on the following statements made by Golliver to Tarver on August 30, 2016:

> ILKB was suitable for absentee or semi-absentee ownership, which meant that Tarver would have to work only a few hours at his ILKB studio.  (Tarver Dep. 180-82, 297.)  ILKB studios required little or no hands-on involvement by the studio owner.  (Garner Opp. Decl., Ex. 22, Tarver Answer to Interr. No. 3.)

> The maximum cost to start the franchise was $275,000.  (Tarver Answer to Interr. No. 3.)

> Other franchisees made monthly profits ranging from $10,000 to $20,000 and Tarver should make that much in monthly profit.  (Id.)

There were no struggling ILKB franchisees.  (Id.)

ILKB locations broke even before their grand openings.  (Id.)

ILKB handled all the marketing.  (Tarver Opp. Decl. ¶ 25.)

You only need 200 members to break even.  (Tarver Answer to Interr. No. 3.)

ILKB works well with franchisees and is very responsive.  (Tarver Answer to Interr. No. 3.)

No ILKB franchises had closed.  (Tarver Opp. Decl. ¶ 25.)[1]

Golliver denies making any of these statements, except that she admits

stating that there had been no ILKB studio closures.  (Def. Ex. E, Golliver (MH)

Dep. 25-28.)

### C.    Mount Holly's Standing

---

[1] There are certain other representations that are mentioned in the briefing but that Plaintiffs have now withdrawn:
ILKB provided the best absentee owner model.
An ILKB studio can be successfully managed from a state other than where the studio is located.
A 63-year-old man managed an ILKB studio from out of state and reached the breakeven point in 18 days.
ILKB took down Groupon with so many sales.
ILKB is really a marketing company.
ILKB will spend its own money trying out a marketing gimmick.  (Pls. Opp. at 11-12 n.2.)

Defendants assert that Mount Holly does not have standing to assert any of the claims in the Complaint because the Complaint does not allege that Mount Holly relied on Defendants' representations.  Tarver avers: "[Golliver] told me that it would be advisable for me to create a legal entity – such as a limited liability corporation – to own my franchise business and that I should run the business through such an entity.  I told her that I was familiar with the advantages of LLCs, and planned to use a LLC to operate my franchise business if I went forward."  (Tarver Opp. Decl. ¶ 23.)

> A defendant is liable to a business entity for fraudulent representations made to a party which induce the formation of a business entity and that entity then does the very things the representations were designed to promote, such as the purchase of a piece of property pursuant to a contract.

Simaan, Inc. v. BP Products N. Am., 395 F. Supp. 2d 271, 277-78 (M.D. N.C. 2005) (citations omitted).  See also Restatement (Second) of Torts § 531 ("One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.").

Here, Defendants made all of the alleged misrepresentations to Tarver, before Mount Holly was formed, and Tarver acted on those alleged misrepresentations to his detriment by purchasing the franchise unit from ILKB. However, Plaintiffs also provide evidence that Golliver advised Tarver to form an entity such as Mount Holly to operate the very franchise she was encouraging him to buy.  Therefore, there is evidence that Golliver intended Tarver and his future LLC to rely on her representations to purchase and operate the ILKB franchise.  The Court concludes that Mount Holly has standing.

### D.    Financial Performance Representations

Plaintiffs assert that ILKB (and Defendants) made multiple financial performance representations that violated New York and federal law.  See 16 C.F.R. § 436.9(c); 13 C.R.R.-N.Y. § 200.2, Item 19(A).  However, there is no private right of action for violation of FTC rules:

> [An] effort to incorporate the specific prohibitions and requirements of the FTC Rule into a fraud claim is in effect an attempt by a private party to enforce the terms of [the FTC Rule] against another private party.  However, [i]t is well settled that there is no [] private cause of action for violation of the FTC franchise disclosure rules.  Therefore, Defendants cannot base their fraud claims on such an alleged violation.

Yogo Factory Franchising, Inc. v. Ying, No. CIV.A. 13-630 JAP TJ, 2014 WL 1783146, at *9 (D.N.J. May 5, 2014) (citation omitted).

### E.      Count 3: Fraud

#### 1.      Elements of Fraud

To make out a claim for fraudulent misrepresentation, the plaintiff must establish that:

(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

Hoyt Properties, Inc. v. Prod. Res. Grp., L.L.C., 736 N.W.2d 313, 318 (Minn. 2007)

(citation omitted).  "To prevail on a claim of fraudulent misrepresentation, the

complaining party must set forth evidence demonstrating both actual and

reasonable reliance."  Id. at 320–21.

#### 2.      False Representation of a Past or Existing Material Fact Susceptible of Knowledge

##### a)      Nonactionble Representations of Future Events

Under Minnesota law:

a representation of expectation as to future acts or events is not a sufficient ground for the charge of fraud merely because the represented act or event did not take place.  Such representations are not treated as assertions of existing facts and amount to nothing more than conjectures of future events.  To amount to actionable

fraud, a representation must be material as to a past or existing fact, and not to a future event.

Cady v. Bush, 166 N.W.2d 358, 361 (Minn. 1969) (citations omitted).  Thus, Minnesota common law holds that whether projections are actionable "depend[s] upon whether they accurately reflect surrounding past and present circumstances."  Berg v. Xerxes–Southdale Office Building Co., 290 N.W.2d 612, 615 (Minn. 1980).  In other words, "[f]alse promises or projections of profits can be the basis of a fraud action, but only if they are false representations of a past or present material fact."  Crowell v. Campbell Soup Co., 264 F.3d 756, 764 (8th Cir. 2001) (citations omitted).

### b)   Puffery

"[B]ecause fraud requires a misrepresentation concerning a past or present material fact susceptible of knowledge, statements of prediction, opinion, or 'puffery' cannot form the basis of a fraud claim."  Teng Moua v. Jani-King of Minn., Inc., 810 F. Supp. 2d 882, 890 (D. Minn. 2011) (citation omitted).  "[T]ypical sales statements cannot be material to a serious business decision."  Id.

> Puffery consists of exaggerated blustering or boasting and vague, subjective statements of superiority.  Such statements are typically general and vague.  For instance, . . . this Court [has] found that statements that a franchise was a 'good business' that would be around for 'a long time,' were puffery.

31

<u>Knotts v. Nissan N. Am., Inc.</u>, 346 F. Supp. 3d 1310, 1326 (D. Minn. 2018) (citations omitted).  "General assertions of quality are also puffery because 'quality' is a vague, subjective concept."  <u>Bernstein v. Extendicare Health Servs., Inc.</u>, 607 F. Supp. 2d 1027, 1031 (D. Minn. 2009).

"Regardless of education or experience, consumers expect to hear <u>some</u> level of non-specific and optimistic references to a product's quality by its seller." <u>Teng Moua</u>, 810 F. Supp. 2d at 891.  In any case, here, Tarver graduated from West Point with a major in systems engineering, earned an MBA, ran his own real estate business, and had a successful career in sales and management.

The Court now turns to the specific representations that form the bases for Plaintiffs' fraud claim.

c)     **ILKB was suitable for absentee or semi-absentee ownership, which meant that Tarver would have to work only a few hours at his ILKB studio.  ILKB studios required little or no hands-on involvement by the studio owner.**

The assertion that ILKB studios required little or no hands-on involvement by the studio owner and that ILKB was suitable for absentee or semi-absentee ownership such that Tarver would have to work only a few hours at his ILKB studio is a prediction of future events.  However, the statement is not actionable

32

because Plaintiffs point to no evidence that, in August 2016, ILKB studios were

not suitable for semi-absentee ownership and required significant hands-on

involvement by the studio owner.

"It is axiomatic that fraud cannot be predicated on the truth. A true

representation is not actionable." Franklin Theatre Corp. v. City of Minneapolis,

198 N.W.2d 558, 560 (Minn. 1972) (citation omitted). "To avoid summary

judgment, [Tarver] had the burden to show each element of the fraud claim."

Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir.

1997) (footnote omitted). When the plaintiff fails to offer admissible evidence

that a statement was false when made, the defendant is entitled to summary

judgment. See, e.g., Vandeputte v. Soderholm, 216 N.W.2d 144, 147 (Minn. 1974);

Nelson v. Am. Fam. Mut. Ins. Co., 899 F.3d 475, 482 (8th Cir. 2018); Radford v.

Kanabec Cty. of Minn., No. 12-CV-1998 SRN/LIB, 2014 WL 359342, at *4 (D.

Minn. Feb. 3, 2014). See also Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d

359, 364 (Minn. 2009) (providing that party opposing summary judgment "must

present more than evidence which merely creates a metaphysical doubt as to a

factual issue and which is not sufficiently probative with respect to an essential

element of the nonmoving party's case to permit reasonable persons to draw different conclusions") (quotation omitted).

Tarver avers that his franchise "proved not to be suitable for absentee or semi-absentee ownership." (Tarver Opp. Decl. ¶ 36.) But the fact that an event did not occur as predicted is insufficient to show that it was not based on past or present facts at the time it was made. See, e.g., Vandeputte v. Soderholm, 216 N.W.2d 144, 147 (Minn. 1974) ("It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place."). Furthermore, Tarver avers that ILKB told him that its studios did not require direct owner involvement and that, during validation, none of the franchisees contradicted ILKB's representations. (Tarver Opp. Decl. ¶ 32.) This evidence weighs against a finding of falsity, not for it. Finally, the declaration of one ILKB franchisee averring that he became a franchisee on April 30, 2015, and from that date until 2017, ILKB did not request from him information regarding his profit and loss statements, when he broke even, how much he invested, or how much time he spent on his business does not raise a genuine question of material fact regarding whether Golliver's statement was false. (See generally Salyers Decl.) Because

34

Plaintiffs fail to point to admissible evidence showing that Golliver's statement was false when made, the statement cannot serve as the basis for Plaintiffs' fraud claim.

### d)   The maximum cost to the franchise was $275,000.

This statement is a prediction of future events  - that it would only cost Tarver $275,000 to start an ILKB franchise.  Under Minnesota law, a future prediction can still be actionable if, at the time it was made, it does not accurately reflect surrounding past and present circumstances.  Here, Plaintiffs have presented no evidence that, when Golliver made the statement August 2016, it did not reflect past or present circumstances.  Moreover, Tarver averred that ILKB told him that the "sweet spot" for total investment was $250,000 and that, during validation, no franchisee contradicted what ILKB had said to him; this evidence weighs against a finding of falsity, not for it.

### e)   Other franchisees made monthly profits ranging from $10,000 to $20,000 and Tarver should make that much in monthly profit.

The first part of the statement is a statement of fact, and the second portion is a prediction of future events.  However, neither is actionable because Plaintiffs point to no evidence that, in August 2016, other franchisees did not make

monthly profits ranging from $10,000 to $20,000.  Furthermore, Tarver avers that

ILKB told him that ILKB franchisees should be making $120,000 per year in

profits and that, during validation, no franchisee contradicted anything that

ILKB told him; this evidence weighs against a finding of falsity, not for it.

### f)      There were no struggling ILKB franchisees.

This is a statement of present fact.  However, Plaintiffs fail to point to

evidence that, in August 2016, there were struggling ILKB franchisees.

Moreover, Tarver avers that, during validation, the franchisees told him about

the marketing successes that they were experiencing and none contradicted any

of the representations that ILKB had made; this evidence weighs against a

finding of falsity, not for it.

### g)      ILKB locations broke even before their grand openings.

Plaintiffs fail to present evidence that, as of August 2016, ILKB locations

did not break even before their grand openings.  Without evidence that this

statement was false when made, the statement is inactionable.  Moreover, Tarver

avers that ILKB told him that, on average 600 memberships were sold before

opening and the fewest sold was 315, yet only 200 members were needed to

break even.  He further averred that, during his validation, none of the franchisees contradicted the representations that ILKB had made.  This evidence weighs against a finding of falsity, not for it.

### h)    ILKB handled all the marketing.

Plaintiffs fail to present evidence that, as of August 2016, ILKB did not handle all of the marketing.

### i)    You only need 200 members to break even.

This statement is a prediction of future events  - that, in the future, if Tarver started a franchise, he would only need 200 members to break even. Plaintiffs have presented no evidence that, when Golliver made the statement August 2016, it did not reflect past or present circumstances.  Furthermore, Tarver avers that ILKB also told him that it was only necessary to have 200 members to break even and that, during validation no franchisee contradicted ILKB's representations; this evidence weighs against a finding of falsity, not for it.

### j)    ILKB works well with franchisees and is very responsive.

This statement is inactionable puffery. Whether a franchisor "works well" with franchisees is a subjective and vague statement incapable of objective proof. Similarly, "very responsive" is vague, subjective, general sales boasting. Moreover, Plaintiffs fail to present evidence that, as of August 2016, ILKB did not work well with franchisees and was not responsive to franchisees, as opposed to FranChoice. Tarver avers that, during validation, no franchisee contradicted ILKB's statements and they told him of their marketing successes; this evidence weighs against a finding of falsity, not for it.

### k)   No ILKB franchises had ever closed.

This statement is a statement of past fact that was explicitly contradicted by the FDD, which provided a list and contact information for all of the 12 of the outlets that had ceased operations (noting the outlets that had been reacquired). Thus, this statement is actionable as a false representation of past or existing fact.

### 3.   Reasonable Reliance

"Ordinarily, the reasonableness of reliance is a fact question for the jury." Nicollet Restoration, Inc. v. City of St. Paul, 533 N.W.2d 845, 848 (Minn. 1995). However, justifiable reliance is a question of law if the "record is devoid of any facts which would support a conclusion that . . . reliance was reasonable." Id.

"Justifiable reliance is judged under the standard of 'a person [with] the capacity and experience of the [plaintiff].'" SRRT Properties, LP v. Nova Consulting Grp., Inc., No. A19-0523, 2019 WL 5152463, at *7 (Minn. Ct. App. Oct. 14, 2019) (quoting Berg v. Xerxes-Southdale Office Bldg. Co., 290 N.W.2d 612, 616 (Minn. 1980). Reliance is measured "in the context of the aggrieved party's intelligence, experience, and ability to investigate the facts at issue." Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369 (Minn. 2009)) (citation omitted). Moreover, "[w]hen a party conducts an independent factual investigation before it enters into a commercial transaction, that party cannot later claim that it reasonably relied on the alleged misrepresentation." Id. See also Reisdorf v. i3, LLC, 129 F. Supp. 3d 751, 767 (D. Minn. 2015) ("Because the evidence establishes that [the plaintiff] is an experienced businessman who had ample opportunity . . . to investigate any allegedly fraudulent statements made by [the defendant], but did not do so, the Court finds that [the plaintiff] cannot show that he acted in reasonable reliance on the allegedly fraudulent statements made by [the defendant].").

As noted above, there is only one actionable statement of false past or present fact upon which Plaintiffs base their fraud claim: Golliver's statement

39

that no ILKB franchises had ever closed.  The FDD included a separate section

entitled List of Terminated Franchises that listed each franchisee outlet that had

been "terminated, canceled or not renewed, or otherwise voluntarily or

involuntarily ceased doing business" during 2015 and 2016 with contact

information for each franchisee.  The FDD also separately listed by state the

number of outlets transferred from franchisees to new owners other than the

franchisor, the number of outlets reacquired by the franchisor, the number of

outlet terminations, and the number of outlets that ceased operations for other

reasons.  Tarver was a West Point graduate with a major in systems engineering,

earned an MBA, ran his own real estate business, and had a successful career in

sales and management.  Defendants repeatedly emphasized that Tarver needed

to conduct his own investigation into ILKB; and Tarver testified that he

understood that Defendants wanted him to do so and that he expected ILKB to

be the most knowledgeable about its own franchise.  He reviewed ILKB's entire

FDD and reviewed the contents of the FDD with an acquaintance who was an

experienced franchisee.  Given these uncontradicted facts, Tarver cannot be said

to have reasonably relied on Golliver's statement that no ILKB franchise had ever

closed when the ILKB FDD explicitly listed the ILKB franchises that had closed

and included the information needed to contact those franchisees. "A party cannot reasonably rely on a representation if its falsity is known or obvious to the listener." Provell, Inc. v. JetChoice I, LLC, No. A10-2255, 2011 WL 2750717, at *2 (Minn. Ct. App. July 18, 2011).

Because Plaintiffs cannot show justifiable reliance on the only actionable statement on which they base their fraud claim, Defendants are entitled to summary judgment on Count 3.

### F.   Count 4: Negligent Misrepresentation

#### 1.   Elements of Negligent Misrepresentation

Minnesota law provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Williams v. Smith, 820 N.W.2d 807, 815 (Minn. 2012) (citation omitted).

> To prevail on a negligent misrepresentation claim, the plaintiff must establish: (1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information.

<u>Williams</u>, 820 N.W.2d at 815.

### 2.      Discussion

As discussed with regard to Plaintiffs' fraud claim, Plaintiffs fail to raise a

genuine issue of material fact regarding the falsity of eight of the nine statements

on which they base their claims.  As to the ninth statement, that no ILKB

franchises had ever closed, Plaintiffs cannot raise a genuine issue of material fact

regarding reasonable reliance.  For these reasons, Defendants are entitled to

summary judgment on Count 4: Negligent Misrepresentation.

### G.      Count 1: Violation of the New York Franchise Sales Act

### 1.      Application of the New York Franchise Sales Act

Defendants reassert their arguments, rejected at the motion to dismiss

stage, that the New York Franchise Sales Act ("NYFSA") does not apply to

FranChoice and its consultants.  The Court need not revisit this issue because,

assuming that the NYFSA does apply, Defendants are entitled to summary

judgment.

### 2.      Merits of the NYFSA Claim

"To state a claim under § 687, Plaintiffs must plead that (1) Defendant

made an untrue or misleading statement of material fact, and that (2) Plaintiffs

reasonably relied on that statement, (3) causing harm to Plaintiffs." <u>Governara v.</u> <u>7-Eleven, Inc.</u>, No. 13-CV-6094 LAP, 2014 WL 4476534, at *4 (S.D.N.Y. Aug. 20, 2014).

### a)   Untrue or Misleading Statement of Material Fact

"[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events." <u>Trahan v. Lazar</u>, 457 F. Supp. 3d 323, 350 (S.D.N.Y. 2020).  However, "statements based on historical and present facts are properly characterized as misrepresentations of fact if their misleading nature can be verified at the time they are made, even if they are couched as predictions of future events." <u>Governara</u>, 2014 WL 4476534, at *5 (citations omitted).  For the same reasons that eight of the nine alleged statements are not actionable under Minnesota common law fraud, they are not actionable for the NYFSA claim.

### b)   Reasonable Reliance

In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision.

<u>JP Morgan Chase Bank v. Winnick</u>, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004). When "[c]ircumstances [are] so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false . . . a plaintiff cannot reasonably rely on those representations, but rather must make additional inquiry to determine their accuracy," and "[o]nce the duty to inquire is triggered, . . . a plaintiff is foreclosed from bringing a claim for false representations if no inquiry is made." <u>Id.</u> at 406-07 (citations omitted).

As discussed with respect to the fraud claims, Tarver read the FDD before deciding to purchase the ILKB franchise and testified that he thought that ILKB, not Defendants, would be the most knowledgeable source for information about its franchise. The FDD blatantly contradicted Golliver's alleged representations that no ILKB franchise had closed, listed the closed franchises, and provided contact information for Tarver to contact those franchisees if he so desired. Tarver cannot have reasonably relied on Golliver's representation that no ILKB franchise had every closed.

Defendants are entitled to summary judgment on Count 1.

**H.      Count 2: Violation of the North Carolina Unfair and Deceptive Trade Practices Act**

1.   **Overview of the North Carolina Unfair and Deceptive Trade Practices Act**

The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") prohibits "unfair or deceptive acts of practices in or affecting commerce."  N.C. Gen. Stat. § 75-1.1(a).

> In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. In making a claim of unfair and deceptive trade practices on a theory of misrepresentation or fraud, a plaintiff must show that a defendant's words or conduct possessed the tendency or capacity to mislead or create the likelihood of deception.  Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show actual reliance on the alleged misrepresentation in order to establish that the alleged misrepresentation proximately caused the injury of which plaintiff complains.

Hospira Inc. v. Alphagary Corp., 671 S.E.2d 7, 12 (N.C. Ct. App. 2009) (citations omitted).

"Two key elements specific to the plaintiff combine to determine detrimental reliance: (1) actual reliance and (2) reasonable reliance."  Bumpers v. Cmty. Bank of N. Va., 747 S.E.2d 220, 227 (N.C. 2013).  "In the context of a misrepresentation claim brought under section 75–1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation

into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether." Id.  "The second element, reasonableness, is most succinctly defined in the negative: Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." Id. at 227 (citations omitted).

"Under North Carolina law, reliance is unreasonable as a matter of law where a plaintiff relies upon a representation 'directly contrary' to the express terms of a written contract." Solum v. Certainteed Corp., 147 F. Supp. 3d 404, 411–12 (E.D.N.C. 2015) (gathering cases).

### 2.  Notice of Particular Representations

In the Complaint, Plaintiffs assert that their NCUDTPA claim is based on three alleged misrepresentations by Golliver:

a. ILKB franchises were suitable for absentee ownership;

b. That ILKB would successfully handle all marketing needs of the franchise; and

c. That Tarver would earn $10,000 to $20,000 a month.

(Compl. ¶ 31.)  Plaintiffs now seek summary judgment on the NCUDTPA claim based on an amalgam of statements from FranChoice's website that Tarver

46

interpreted to imply that FranChoice would use its expertise to only present franchises that passed its "exacting standards" to be "strong" and "high quality" (Tarver Opp. Decl. ¶ 19); that FranChoice would present only franchises that were safe, stable, and high quality (id. ¶ 20); and that he would have all of the information that he needed about a franchise, particularly with respect to litigation and potentially adverse information (id. ¶ 21).

Defendants argue that, by wholly changing their theory of their NCUDTPA claim for the first time on summary judgment, Plaintiffs failed to provide fair notice of their claim and the grounds upon which it rests. See Gardner v. First Am. Title Ins. Co., 294 F.3d 991, 994 (8th Cir. 2002) (noting that, to comply with Federal Rule of Civil Procedure 8(a), "a claimant need not set out in detail the facts upon which he bases his claims, but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests") (citation omitted). Defendants note that the Complaint mentions some but not all of the website statements upon which Plaintiffs now base their claim, but they are not mentioned in the section of the Complaint entitled "Defendants' Misrepresentations" (Compl. ¶¶ 17-18), but rather are listed in a section of background facts and are not identified as being misleading or untrue (id. ¶ 12).

The Complaint provides no indication that Plaintiffs' NCUDTPA claim is based on statements from FranChoice's website and, in fact, explicitly states that the claim is based on three oral representations by Golliver.  Plaintiffs provide no explanation as to why they could not have included the alleged website misrepresentations in their Complaint, why they could not have sought to amend their Complaint within the time permitted to add these allegations, or why they could not have otherwise given Defendants notice of their allegations before Tarver's deposition or the filing of Plaintiffs' summary judgment motion. Thus, it would be unfairly prejudicial to Defendants to consider granting summary judgment for Plaintiffs based on alleged misrepresentations of which Defendants had no notice and, thus, no opportunity to address in discovery.  See United States ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC, 833 F.3d 874, 880 (8th Cir. 2016) (upholding district court's refusal "to consider a theory first articulated in [party's] summary judgment papers"); Altendorfer v. Kroll Ontrack, Inc., No. 04-4822(JNE/SRN), 2006 WL 1314318, at *6 n.4 (D. Minn. May 12, 2006) (declining to consider new factual basis for Plaintiff's claim raised for the first time on summary judgment).

### 3.   Actionable Statements

Even if the Court did allow Plaintiffs to seek summary judgment based on the new allegations, their claim would fail because none of the statements are actionable.  "[U]nder the UDTPA, a person cannot reasonably rely on mere puffery."  <u>Solum</u>, 147 F. Supp. 3d at 412.  <u>See also</u> <u>Global Hookah Distributors, Inc. v. Avior, Inc.</u>, 401 F. Supp. 3d 653, 660 (W.D.N.C. 2019) (holding that "puffery cannot form the basis of fraud or UDTPA claims").

> Puffery is an exaggerated statement which no reasonable buyer would be justified in relying on or a claim of superiority so vague that nothing can be understood from it except that it is an opinion. General statements of comparison or superiority are puffery and are not actionable as a matter of law.

<u>Solum</u>, 147 F. Supp. 3d at 412 (citations omitted).  Thus, statements that a particular designation of certain construction contractors on the defendant's website as "Master Craftsmen" implying that the designation "was 'highly prestigious' or only available after completion of a 'rigorous course' and 'examination of credentials,' [] are too vague and general to amount to anything more than mere puffery."  <u>Solum</u>, 147 F. Supp. 3d at 412–13.  The result is the same with regard to the website statements quoted by Plaintiffs:

### a)   Pre-Screening to Provide Safe, Stable, Strong, and High-Quality Franchises

This statement is inactionable puffery.  Stating that FranChoice had pre-screened could be interpreted as misleading and actionable if, for example, there was evidence in the record that FranChoice did no prescreening.  However, here, there is no dispute that FranChoice did have a prescreening process and that it followed that process with ILKB.  Before signing a contract to refer to ILKB, FranChoice reviewed the FDD, talked to ILKB management, and validated with every existing ILKB franchisee of standard outlets, all of whom gave positive feedback.  This prescreening was not as in-depth as Plaintiffs wish, but it cannot be said that there was no prescreening.

In context, whether a franchise is safe, stable, strong, and high quality is subjective puffery.  And there is no dispute that FranChoice did conduct a level of screening, the feedback from all franchisees was very positive, and the FDD did not raise flags for FranChoice.

### b)      Consultants Truly Understand Franchisors

Plaintiffs claim that FranChoice's statement that its consultants "need to truly understand each of our franchise companies so they can represent the business accurately," was false, because Golliver's only sources of

information about ILKB were ILKB presentations, one sheets, and anecdotal information; Golliver never saw an ILKB FDD.

This statement is inactionable puffery; additionally, Plaintiffs cannot show that it is false or misleading. A statement that someone "truly understands" something is a vague, generalized puffery. If Plaintiffs could point to evidence that Golliver knew nothing about ILKB, then, perhaps, they could make an argument that it is misleading to say FranChoice consultants need to truly understand the franchises when, in fact, Golliver knew nothing. But, here, Golliver did know something about ILKB. She had information from ILKB's launch call, from semi-annual ILKB presentations, from ILKB's one sheets, and from feedback from other candidates ILKB validations. Plaintiffs argue that she needed to have reviewed ILKB's FDD in order to truly understand it. This is a purely subjective opinion. Additionally, in context, FranChoice's website repeatedly emphasizes that the candidate will receive the current FDD from the franchisor, so there is no implication that consultants such as Golliver have reviewed the FDD and would provide a summary of its context to candidates.

c)      Experts

First, the representations that FranChoice consultants are experts is puffery.  See Solum, 147 F. Supp. 3d at 412–13 (holding that boast of superiority, such as that that a certain designation is "prestigious" and required completion of a "rigorous course," constitutes inactionable puffery).  The fact that there is a defined standard in the Federal Rules of Evidence for whether a person is an expert qualified to testify in federal court does not mean that Rule 702 provides a generally applicable rule such that no one can use the word "expert" in an advertisement unless they have conducted a Rule 702 analysis.

Second, even if representing a person or company as an "expert" is not puffery in some instances, such as if a person holds themselves out to be an "expert" in a field in which they have no experience or education, it cannot be shown to be actionable here.  FranChoice is a company that specializes in franchise consulting.  There is no dispute that this is the company's specialty.  Golliver was part owner of a franchisor, worked selling franchises for two companies, and had worked as a FranChoice consultant for three years by the time she met Tarver.  Plaintiffs fail to show how she is not an "expert" in franchising.

### d)      Litigation Record

Plaintiffs claim that the following statement is false because FranChoice did not examine ILKB's litigation history:

> These companies must meet the exacting standards we have set to be included in our inventory. We examine the record of the franchisor relating to litigation, failures and, most importantly, the satisfaction of the existing franchisees with the people and opportunity they are involved in. We only want to work with the best.

(Garner Opp. Decl., Ex. 1 at FC2793)

To the extent that this statement is not vague boasting constituting inactionable puffery ("exacting standards" "want to work with the best"), there is no evidence that it is untrue. The uncontradicted evidence in the record is that FranChoice did examine ILKB's 2013 FDD, including Item 3, where ILKB was required to disclose certain relevant litigation, and did validate with all existing standard franchisees in 2013, receiving only "very positive" feedback. The vague statement that FranChoice examines the record of the franchisor relating to litigation cannot reasonably be interpreted to mean that, in addition to reviewing the record of litigation that the FTC deems relevant for the franchisor to reveal in the FDD, FranChoice also promised to do an independent PACER search for all litigation involving FranChoice and its officers in all courts.

e)   **Information a Potential Franchisee Needs**

Plaintiffs also base their claim on FranChoice's statement: "We provide the information a potential franchisee needs to find the opportunity that fits their goals, plus we already know many of the safest and most attractive opportunities in franchising, a task that can take months for someone outside the industry." (Id. at FC2792.) This statement is vague boasting constituting inactionable puffery. The type of information that a potential franchisee "needs to find the opportunity that fits their goals" is subjective.

The statement is also about a future action – a representation that if the candidate works with FranChoice, FranChoice will provide the information that the potential franchisee needs to find the opportunity that fits their goals. Defendants did provide Tarver with direction on how to investigate a franchise, including directing him to review the FDD and providing sample questions for the franchisor and for the franchisees during validation. However, ultimately, Tarver did not receive the information regarding ILKB that he thought he needed. With regard to statements of future action under North Carolina law, "[t]here must be evidence that the [promisor] had a specific intent not to perform at the time a promise was made. Thus, where a plaintiff does nothing more than assert that [a promisor] never intended to honor its obligations under [an]

54

agreement, dismissal as a matter of law is appropriate." Global Hookah

Distributors, Inc., 401 F. Supp. 3d at 660 (citations omitted).  Plaintiffs provide no

evidence of Defendants' specific intent to not provide Tarver with the

information he needed.  "Fraud cannot be predicated on Defendant's poor

calculation of its capabilities." Id. at 659.

### f)        Statements Alleged in the Complaint

In the Complaint, Plaintiffs base their NCUDTPA claim on the following

three statements: 1) ILKB franchises were suitable for absentee ownership; 2)

ILKB would successfully handle all marketing needs of the franchise; and 3)

Tarver would earn $10,000 to $20,000 a month.  As discussed with regard to the

Minnesota common law claims, these statements are predictions of future events

and there is no evidence that the statements were false representations of past or

present facts at the time they were made; thus, they are inactionable.  Defendants

are entitled to summary judgment on Count 2.

### I.        Affirmative Defense

Because the Court has granted summary judgment for Defendants on

claims against them, it need not reach the issue of Defendants' affirmative

defenses.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.     Plaintiffs' Motion for Partial Summary Judgment [Docket No. 57] is **DENIED**.

2.     Defendants' Motion for Summary Judgment [Docket No. 64] is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE**.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  March 24, 2021                    s/Michael J. Davis
                                          Michael J. Davis
                                          United States District Court

56